BOWLING, Justice,
for the Court:
The primary question involved in this appeal from the Circuit Court of Rankin County is whether or not appellee’s evidence was sufficient to make a jury question on liability of appellant, Reserve Life Insurance Company, for punitive damages for failure to pay appellee’s claim for medical and hospital benefits under the policy of insurance issued to appellee. Appellee received a jury verdict of $2,416 as actual expenses owed under the policy and a verdict of $158,000 as punitive damages. As is often the case, the Court is required to apply applicable legal principles to the particular facts of a particular case. As usual, those facts are different from any other case previously considered.
Mr. and Mrs. Henry McGee resided in Rankin County, Mississippi. For approximately five years Mrs. McGee had a policy of what is commonly known as “hospitalization insurance” with appellant, Reserve Life Insurance Company. Mr. McGee had his insurance with Blue Cross-Blue Shield Company. This policy with Blue Cross-Blue Shield was approaching the renewal date and Mr. and Mrs. McGee discussed the fact that Mr. McGee’s policy did not provide for adequate room charge payments and, for this reason, the Jackson office of appellant [hereinafter referred to as Reserve] was requested to have someone contact them about insuring McGee with that company.
On the night of February 18, 1980, Mr. Bill Nunn came to the McGee home for the purpose of discussing Mr. McGee’s insurance and a possible application to Reserve. Mr. Nunn was the agency director for Reserve and also actively solicited and secured applications for policies. The main conflict in the evidence, which is important in the disposition of the cause, was the testimony of Mr. and Mrs. McGee and that of Nunn regarding the completion of the application for insurance. A copy of this application is attached hereto as Appendix “A”. There are seven questions on the application. Four of these have sub-questions. After each question and sub-question there were two blocks, one under “yes” and one under “no.” All of these questions refer to the physical conditions of the applicant Mr. McGee and most of them list specific medical conditions, requesting whether or not the applicant was suffering from any of those physical infirmities. Mr. McGee, who has a third grade education, testified positively that Nunn did not read each question to him, but asked in general terms regarding Mr. McGee’s health. McGee testified that he told Nunn that he was in “good” health. McGee testified that as shown under question 10(b) of the application, Nunn was told that McGee’s physician was Dr. Bobo of Pearl and that Nunn could secure any information needed from Dr. Bobo pertaining to McGee. Nunn was advised that McGee had not been confined to a hospital in the past five years, but had been seen by Dr. Bobo. At Nunn’s request, McGee executed a written authority for the appellant company to contact Dr. Bobo and secure any medical information from him regarding McGee’s prior record before the policy was issued. It was the McGees’ understanding that this would be done. Their sworn testimony was that Nunn told them it would be done. It is noted, as shown on the attached copy of the application, that Nunn in the blanks at the bottom of the application under the response to question 10(b) wrote “complete physical by Dr. Bobo.” In the next blank Nunn wrote “ex. health.” We digress here and state that Nunn in his *805 testimony agreed that McGee stated he was in “good health” and Nunn was the one who wrote “excellent health.”
Appellee and his wife gave Nunn a check for the first month’s premium. Nunn’s testimony was that for the first year a policy is in force, he receives something around fifty percent of the premiums and thereafter a lesser percentage during the life of the policy. McGee executed a form that gave appellant company authority to draw a draft on the McGee account each month for the monthly premiums.
The appellant company issued Mr. McGee the policy of insurance dated March 16, 1980, approximately a month after the application was secured, but in time for the Blue Cross-Blue Shield policy to be can-celled.
In September 1980 appellant McGee began having some trouble with his urinary tract. He conferred with Dr. Bobo, who referred him to Dr. Charles Jackson, a specialist in Jackson. Jackson examined McGee and found a lesion on his bladder. McGee was admitted to the St. Dominic’s Hospital in Jackson on September 16, 1980, and by using special instruments, the lesion was removed. An examination determined that the lesion was a transitional cell carce-noma of a low grade and short prior existence. Appellee was in the hospital nine days and was discharged with a good prognosis. After discharge, the proper forms were completed for benefits under the policy discussed above and the forms forwarded to appellant company. McGee heard from appellant company by receiving a form dated December 3, 1980, in which the company representative stated that they needed more information and “we will appreciate your courtesy while your file is being completed.”
On December 14, 1980, McGee again was hospitalized by Dr. Jackson for a period of five days. He had noted some irregularity in the bladder that was suspicious and wanted to check this situation. As a result of that hospitalization, Dr. Jackson was of the opinion that the trouble was inflammatory and there was no evidence of residual tumor. He was treated and at the time of the trial on November 4, 1981, there had been no further evidence of bladder tumor regarding Mr. McGee. According to Dr. Jackson, there was no connection between McGee’s bladder problem and any transient ischemic attack he might have had in the past.
By letter dated January 12, 1981, McGee was informed by appellant company that their file still was incomplete with respect to the September 16, 1980, hospitalization and that their representative was still investigating his medical history. This letter ended with “Thank you again for your continued patience and cooperation.” Understandably, Mr. McGee’s patience by that time was somewhat tested. He, therefore, employed an attorney to represent him in his claim for hospitalization benefits. This culminated in a letter dated February 12, 1981, to McGee’s attorney advising:
We have learned of ten separate dates of office visits to Dr. Bobo during 1977, 1978 and 1979, some of which were for treatment of a condition which would have been pertinent to our acceptance of Mr. McGee for coverage with this Company.
Had the Company known of Mr. McGee’s history of transient ischemic attack, which dates back to at least June 1978, coverage would not have been issued to him. The initial premium submitted with the application would have been returned along with a letter of explanation.
Although we have only recently learned of this history, our obligation remains the same as it was initially, and is limited to a refund of premiums paid to date. The policy should be attached to the enclosed draft before taking the draft to the bank for payment.
The check included payments for five months’ premiums that the company had been issuing a draft for and collecting thereon during the time of their “investigation.” The evidence revealed that during that period of time, appellant company had employed a large investigation firm named *806 Equifax Services to investigate McGee’s medical history. In addition to that of McGee’s personal physician for five years prior to the application, as hereinbefore discussed, the Equifax investigation was directed to hospitals and doctors, including a Dr. Lee of Forest and local hospitals. No hospitalization was found in this extensive investigation. It was ascertained that there were two Dr. Lees in Forest, Mississippi. According to Equifax Services, “A thorough search of Dr. John Paul Lee’s records” was made and no record was found on a Henry McGee. A search of the records of Dr. Charles David Lee revealed that he had seen a Henry McGee four times: October 13, 1959; April 5, 1965; November 15, 1965; and December 15, 1966. All four of these visits during the seven year period were for such things as bronchitis. The last visit in December of 1966 was for treatment of a cough.
Introduced in evidence was a memo dated February 3, 1981, from a Mr. Rowland [a witness at the trial] to the underwriting manager relating that he would have declined the original application and gave as a reason under the heading “claim history developed” the following: “History of TIA with office visits, June 16,1978, and July 2, 1979, as well as checks and prescriptions.”
We, therefore, find that after giving up on the wide-spread investigation of McGee, appellant relied solely on the record of Dr. Bobo of Pearl, whose name McGee had given Nunn the night the original application was taken and when McGee signed the authority at the request of Mr. Nunn for Dr. Bobo to give any information to appellant company prior to the issuance of the policy. This record of Dr. Bobo is as follows:
2-13-76 infection behind left ear
2-7-77 flu syndrome
2-10-77 re-check
2-14-77 re-check
6 — 16—78 tia
6-20-78 re-check
6-19-78 headache and bronchitis
12-13-78 contusion of nose
12-19-78 flu syndrome
6-2-79 headache and tia
7-11-79 re-check
5-2-80 bronchitis
12-19-80 flu syndrome
For the two TIA diagnoses, Dr. Bobo prescribed nicotonic acid, the same medication used to treat inner ear trouble that causes dizziness.
Referring to the pleadings, the declaration was filed on April 1, 1981, with allegations in detail as to Nunn’s visit to secure the application and in much other detail, including refusal of appellant company to pay the claim. The declaration included a request for punitive damages against Reserve. There were general denials by Reserve of most of the declaration’s paragraphs. After this we find “first affirmative defense” which reads as follows:
That Henry McGee, Plaintiff, made false statements on his application for insurance with Reserve Life Insurance Company which materially affected either the acceptance of the risk or the hazard assumed by Reserve Life Insurance Company, all according to Section 83-9-11(3), Mississippi Code of 1972, Annotated.
That accordingly, due to the material misrepresentations and false statements of the insured, Henry McGee, policy number 0590994A was rescinded by the company on February 12, 1981, after the company learned of said false statements and material misrepresentations and the insured was refunded the premiums previously paid to said Defendants.
Interrogatory 3 propounded by plaintiff to appellee company is as follows:
3. In the answer filed in this cause on behalf of the defendants, Reserve Life Insurance Company and Bill Nunn, it is alleged that Henry McGee, the plaintiff, made false statements on his application for insurance which materially affected either the acceptance of the risk or the hazard assumed by Reserve Life Insurance Company according to Section 83-9-11(3) of the Mississippi Code of 1972, as annotated. With regard to said allegations, please state the following: Exactly which statements were made by Henry *807 McGee; the exact wording of such statements; to whom said statements were made; on what date; in what way they were false; in what way they materially affected the acceptance of the risk; in what way they materially affected the hazard assumed by Reserve Life Insurance Company.
The appellant’s answer to Interrogatory No. 3 is as follows:
Plaintiff failed to truthfully answer question 10(b) of the application for in- . surance in that he failed to disclose that from the period of February 13, 1976, until July 16, 1979, that he had eleven office visits for various illnesses to Dr. Edgar E. Bobo in Pearl, Mississippi; his answer to that particular question was made to William A. Nunn; February 18, 1980; plaintiff failed to disclose the complete nature of his medical history; plaintiff failed to disclose that he had been diagnosed and treated in June 1978 for transient ischemia attack (TIA) and that had this information been disclosed on the application, defendant Reserve Life Insurance Company would have declined to issue the policy. In addition, due to the several episodes of bronchitis, the policy would have required a waiver eliminating liability for bronchitis even if the TIA had not existed. William A. Nunn lives at Morningside Apartments, F-16, Jackson, MS 39202.
Appellant in its brief stated that “The appellant relied upon the above referenced section [83-9-11(3)] as an affirmative defense to the declaration filed by Mr. McGee.” Appellee replied, denying the affirmative defense, thereby requiring appellant to prove its affirmative defense. Reserve Life Ins. Co. v. Brunson, 252 Miss. 20, 172 So.2d 571 (Miss.1965).
There is no question regarding whether or not appellee’s claims were owed under the terms of the policy. They clearly and undisputedly were covered. Also, the testimony was undisputed that the September and December 1980 hospitalization had nothing whatever to do with the alleged transient ischemia attack or bronchitis attack set up in the affirmative defense.
It was admitted by agent Nunn that when McGee told him he was in good health, then, he (Nunn), of his own volition substituted “excellent” for “good.”
The only request of appellant for a directed verdict at the conclusion of all the evidence was a request in the form of a proposed written instruction from the Court “that it is your sworn duty to return a verdict for the defendant.”
We should say here that during the entire five months appellant was “investigating” the alleged false answer on McGee’s application, the appellant nor its hired representatives contacted Mr. Nunn about what he put on the application and why. He first learned of the facts of the policy cancellation when the company secured a refund of his part of the premiums the company had collected during the five month investigatory period. This is especially important-when considering the undisputed proof that at no time did either Dr. Bobo, Mr. Nunn or anyone else ever mention to appellee the term “transient ischemia attack”. We have already seen that both Mr. and Mrs. McGee testified positively that according to Mr. Nunn the company was going to contact Dr. Bobo prior to issuing the policy. The jury had a right to believe Mr. and Mrs. McGee’s testimony.
There has been a lot written by various members of the judiciary and legal article writers about “bad faith” cases. It is unknown to us how this term “bad faith” came into being. These words were never mentioned in the principal case from this Court of Standard Life of Indiana v. Veal, 354 So.2d 239 (Miss.1977). Some would have us put this term in a straight jacket which no other court has done; this for the obvious reason that in litigation of cases, it is usually hard to make a legal principle all black or all white. Some of them are gray. Before ending this opinion, we shall discuss this situation further.
*808 This is purely and simply a case where the plaintiff was forced to litigate under the previous edicts of this Court regarding liability of an insurance company under a hospitalization policy and regarding if and when the company refusing payment would be subject to an assessment of punitive damages by a jury — nothing more and nothing less. The rules in this game clearly have been set forth by the prior decisions of this Court.
Appellee filed his suit contending that his claim clearly was covered under the terms of the policy [undisputed] and that the company had refused to pay, saying it had cancelled the policy ab initio. The appellant insurance company filed its answer saying that as an affirmative defense they hereby invoke the last sentence of M.C.A. § 83-9-11 (1972), and contend that a false statement on the application gives it a right to cancel the policy as the statement materially affected the acceptance of the risk, even though the claim was clearly covered under the terms of the policy. The case was litigated in the lower court on this basis and there is no need to rehash the evidence hereinbefore set out. Also, the trial court was of the opinion that a jury question existed as to whether or not appellant should prevail under its affirmative defenses and further that the evidence of appellee was sufficient to bring the case within the opinion in Veal, supra, and was sufficient to submit the question of punitive damages to the jury.
The instructions given the jury at the request of parties clearly followed the outline set out in Veal, supra. There we said:
This case demonstrates the necesisty of awarding punitive damages when an insurance company refuses to pay a legitimate claim, and bases its refusal to' honor the claim on a reason clearly contrary to the express provisions of its own policy. If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant’s maximum recovery could exceed the policy limits plus interest, would enable the insurer to pressure an insured to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely.
(354 So.2d at 248).
We also stated in Veal that punitive damages are assessed as an example and warning to others and should be allowed only with caution and within limitation. In Veal we quoted from Snowden v. Osborne, 269 So.2d 858 (Miss.1972), by saying:
Exemplary or punitive damages are those, of course, which are in addition to the actual or compensatory settlement They are granted in the nature of punishment for wrongdoing of the defendant and as an example so others may be deterred from the commission of similar offenses thereby in theory protecting the public, [citations omitted].
In Seals v. St. Regis Paper Co., 236 So.2d 388, (Miss.1970), the Court ... stated: Punitive damages may be recovered for a wilful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong.... [W]e stated in Progressive Casualty Insurance Company v. Keys, 317 So.2d 396 (Miss.1975); (b) punitive damages are not recoverable for the breach of a contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort, (citations omitted).
(354 So.2d at 247).
Now we come to the part of Veal that seems to make everyone want to write articles and request clarification, which, in our opinion, already is perfectly clear. We shall attempt to word it so that all can understand its terms. This is in regard to the paragraph in the opinion which says:
Of course, if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, but in this case the defendant had no reason to contest the *809 claim filed with it. We therefore hold that punitive damages are allowable. (354 So.2d at 248).
The difficulty seems to be in determining who makes the decision whether or not the insurance company has a “legitimate reason” or an “arguable reason” for failure to pay the claim. It should be clear that the rules governing this decision are the same in this case, in Veal, and in all other cases. We stop to say here that in the vast majority of so-called “bad faith” claims for failure to pay, we have held that the company had a legitimate or arguable reason. In only two or three cases have we held that this was a fact for the determination of the jury under a certain set of facts, with proper instructions.
We have already seen that in the present case the trial court was not asked to hold as a matter of law that appellant had a legitimate or arguable reason for denial. He was merely asked in the form of a proposed written instruction that the jury find for appellant. Furthermore, the instructions submitted the issue properly to the jury, under the evidence shown in the record. Appellant requested and received an instruction among other similar instructions that said to the jury:
Punitive damages may be awarded only if you find that the action complained of is of a wanton, malicious or fraudulent nature, or if the injury inflicted was committed by gross negligence indicative of a wanton and wilful disregard of the rights of others. But if the defendant has presented any legitimate, allowable, or arguable reason for voiding the coverage of the policy, there can be no award of punitive damages.
We are discussing this issue of punitive damages here as this issue is tied with the initial liability question; that is, whether or not the company cancelled the policy ab initio under the evidence hereinbefore discussed because it had a legitimate or arguable reason so to do.
We state here that there was a clear question for the jury to determine whether or not appellee made false statements on his application that would permit appellant to cancel the policy months later, after claim made, under Section 83-9-11(3). A failure to have submitted this question to the jury clearly would have been error by the trial court.
Now we consider the contention that, conceding a jury question on the false statement issue, what about the contention that the issue legally created legitimate and arguable reasons sufficient to confine a recovery to that amount actually due under the policy? As said in Veal supra, if this was done, the company would not be liable for punitive damages. As hereinbe-fore stated we now clearly state our position on that question.
1. At the conclusion of the evidence, the trial court at the request of the defendant, should determine whether or not, as a question of law, the insurer had a legitimate or arguable reason to deny payment of the claim. Of course, such a reason should be a reasonable one. If the trial court finds that such a legitimate or arguable claim existed, as shown by the evidence, then the trial court should refuse to grant a punitive damages instruction even though it submits to the jury the question of whether or not the insurer owed the compensatory claim for which proofs of loss were filed. Legitimate or arguable defenses do not mean that the insurer is entitled to a directed verdict on payment of the claim. The trial court, of course, has the question as to whether or not as a matter of law the insurer had the right to deny payment of the actual money claimed under the policy.
2. In the event the trial court determines that as a matter of law it cannot hold that the insurer had a legitimate and arguable defensive position, but that the evidence constituted disputed facts as to whether or not such situation existed, then the trial court should submit that issue to the jury.
The statement in paragraph 2 above is the situation we have in the case sub judice. The evidence clearly made a ques *810 tion for the jury as to whether or not the appellant had a legitimate and arguable reason to prevail in its affirmative defense that the answers given by McGee on the application were of such a nature that the policy could be arbitrarily voided ab initio.
3. After deciding the threshold question of whether or not it is a jury question on the issue of legitimate or arguable reason to deny or cancel, the trial court then should make a determination as to whether or not the evidence is sufficient to submit a punitive damages instruction to the jury under the guidelines set out in Veal, supra.
A case similar to the above holding is shown by the opinion in Henderson v. United States Fidelity & Guaranty Co., 620 F.2d 530 (5th Cir.1980). There the Court of Appeals, using the guidelines set out in Veal, reversed the cause for submission of the punitive damage question to the jury. The Court of Appeals quoted parts of the Veal opinion. It further discussed other cases from this Court regarding the punitive damages question. For instance, they said that “Punitive damages are denied when the insurance company defends, rather than settles, a close case.” Farmers Gin Co., v. St. Paul Mercury Indemnity Co., 186 Miss. 747, 191 So. 415 (1939); ... “when it honestly contests the amount of damage.” Progressive Casualty Insurance Co. v. Keys, 317 So.2d 396 (Miss.1975); ... “when it contests coverage because the insured has failed to meet a policy condition.” Lincoln National Life Ins. Co. v. Crews, 341 So.2d 1321 (Miss.1977). The Court in Henderson, went on to say that:
Punitive damages were allowed when an insurer used its superior bargaining position to delay in paying any part of separate claims, despite the insured’s dire financial straits, because of an unwritten policy to pay the whole claim at once. Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829. (Miss.1979).
(620 F.2d at 536.)
In discussing Veal and in reversing the cause for a determination of the punitive damages question to the jury, the Court of Appeals said: ,
This reversal is proper even though under Mississippi caselaw, USF & G had an arguable defense to coverage, which ordinarily would be sufficient to immunize its actions from punitive sanctions. If Henderson’s position is accepted, UFSF & G’s act in hiding the policy render ineffectual any other defense it had to the punitive damages claim.
(620 F.2d at 537).
Appellant’s principal arguments are contained in its motion for judgment notwithstanding the verdict. As hereinbefore stated, the argument was concentrated on the question as to whether or not as a matter of law appellant had a legitimate or arguable basis for cancelling the policy ab initio after claim was made, and that therefore the lower court erred in submitting the question of punitive damages to the jury. The lower court in its opinion on appellant’s motion for JNOV first held that without a doubt there was a jury question on appellant’s affirmative defense of material, false statements by McGee in completing the application. The motion and opinion in reality went to the question of submitting a punitive damage instruction to the jury. What at first blush appears to be a confusing situation occurred when the trial court in its opinion on the motion stated:
It is the opinion of this Court that a reasonably arguable defense was presented in the trial of this case at the time of the trial, by Reserve Life On that basis, taken alone, the undersigned is of the opinion that Reserve Life should not be held liable for punitive damages.
The trial judge then went on to use much stronger language than the Court of Appeals for the Fifth Circuit used in Henderson, supra, where it said:
This reversal is proper even though under Mississippi case law USF & G had an arguable defense to coverage....
The trial judge in the present case overruled appellant’s motion by using very strong language. It held as follows:
*811 But this court is of the further opinion that “good faith” on the insurer’s part cannot commence with the trial or the litigated portion of the dealings between the insurer and the claimant in a vacuum, unrelated to the entirety of the relationship between the parties. This Court is of the opinion that the insurer owes to the insured a duty to deal in good faith, and vice versa, from the inception of the relationship leading up to the issuance of the contract. Where the defendant has violated this duty to act in good faith punitive damages are appropriate to protect the plaintiff, and more importantly, the public, from intentional wrong, insult, abuse or gross negligence on the insurer’s part. Michael v. National Security Fire and Casualty Co., supra. It is this Court’s opinion that considering the entirety of the relationship between the parties from its inception there was substantial evidence upon which the jury could find abuse of the plaintiff by Reserve Life and insult to the plaintiff and the public. The jury could easily conclude from the facts presented the following:
(a) Plaintiff was an uneducated man, easily led and imposed upon;
(b) A glib talking salesman with a substantial commission to be earned “talked through” the application with claimant, asking all the questions, in plaintiff’s home;
(c) Dr. Edgar Bobo was claimant’s personal physician which was made at the time the application was taken.
(d) Permission was given Reserve Life with the application to communicate with Dr. Bobo and obtain all relevant data concerning his prior medical history.
(e) Simply communications with Dr. Bobo would have revealed any prior transient ischemic attacks, which were alleged to be the misrepresentation in question;
(f) The prior transient ischemic attacks had nothing to do with plaintiff’s bladder cancer for which benefits were claimed under the policy;
(g) Notwithstanding written permission, Reserve Life wrote the policy without communicating in any way with Dr. Bobo;
(h) Any misrepresentations by Plaintiff were innocent ones.
(i) Reserve Life waited until a claim was filed but then utilized its permission to conduct an intensive investigation of plaintiff’s prior medical history.
(j) Reserve Life received and kept monthly premiums for five months after the claim was made before rejecting the claim.
After hearing the entirety of the testimony it is the undersigned’s personal conviction that Reserve Life was guilty of gross negligence, manifest bad faith and abuse of the plaintiff, considering the relationship of the parties as a whole from its inception. Hospital and medical insurance is absolutely essential in this era of astronomical medical costs. Plaintiff cannot now obtain such insurance. Quite likely he could have obtained such insurance at an increased premium at the time the application was made and the time Reserve Life evaluated this risk, even if the transient ischemic attacks came into light. To allow Reserve Life to “sandbag” and gloss over its investigation of plaintiff’s medical history at the time of evaluating the underwriting risk then comb intensively for five months his prior records after a claim is made “looking for a defense” (even based on a condition unrelated to his benefit claim) and then deny coverage “in good faith” is to invite manifest abuse of the public in such relationships. Under such circumstances punitive damage awards provide the public with its best protection from such abuse of this relationship between insured and insurer. The Court is of the opinion that it was correct in submitting the case to the jury on the issue of punitive damages.
So that there may be no confusion as to what we are holding in the case sub judice, we repeat what we previously have said: At the conclusion of the evidence, a ques *812 tion arose as to whether or not as a matter of law the trial court should say that the insurer had a legitimate or arguable reason concerning coverage of the claim. Under the record in this case, we are of the opinion that if at that point the trial court had held that the insurer had such a reason concerning coverage, that holding would have been error. As stated, the evidence clearly made a question for the jury under appellant’s affirmative defenses.
Without being critical, it is obvious that the lower court in the present case did not fully comprehend what it was saying when it, out of context, made the statement in its opinion that a reasonably arguable defense was presented. This is entirely inconsistent with the remaining part of its opinion quoted above in which the lower court in effect says that the plaintiff appeared to be entitled to punitive damages as a matter of law. If the trial court should have held, on proper request, that appellant, as a matter of law, had a legitimate or arguable defense, this would have been error. Of course, it is elemental that the question of punitive damages is for the jury to decide under proper instructions. These were requested and given by the trial court.
In summary we find that the evidence in the record before us clearly presents a question for the jury as to whether or not McGee made a material, false statement in his application which gave appellant sufficient reasons to take the action set out in its affirmative defense. Also, a jury question was made as to whether or not the evidence under the affirmative defense was sufficient to furnish appellant with a legitimate or arguable ground to cancel the policy ab initio.
Thirdly, ample evidence appears in the record for the jury, under proper instructions, to determine in its discretion, if punitive damages should have been assessed against appellant. We further hold that the evidence taken as a whole under the authorities hereinbefore discussed, required the submission to the jury of the punitive damages instruction.
We note the amount of punitive damages for the benefit of those reading this opinion. The amount is not assigned as error, nor is there a request for a reduction by this Court. Appellant put all of its eggs in one basket. We, therefore, technically should not reach this issue.
We have said in many cases that the amount of punitive damages is a discretionary question for the jury, saying:
It is the long settled and uniformly adhered to rule in our jurisprudence that the amount of such punitory or exemplary damages is solely within the discretion of the jury, and, no matter what the sum of their finding might be, interference therewith, unless for exceptional causes, is discouraged .... the reason being that, as the jury are the sole judges of the amount which ought properly to be assessed in order to inflict adequate punishment, the courts should scrupuously avoid any undue interference with their prerogative.... ([Yazoo & Mississippi Valley Railroad Co. v. Williams ] 87 Miss. [344] at 355-356, 39 So. [489] at 491).
(Snowden v. Osborne, 269 So.2d 858 at 861 (Miss.1972)).
See also: Yazoo & Mississippi Valley Railroad Co. v. May, 104 Miss. 422, 61 So. 449 (1913); Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss.1977).
In the above quote we note the words “unless for exceptional causes.”. Out of an abundance of caution we have compared this case with others. Here the award was in the amount of $158,000. The admitted net worth of appellant’s assets only was $102,259,474.
In Richards v. Allstate Ins. Co., 693 F.2d 502 (5th Cir.1982), the final award was $750,000 as punitive damages on an actual damage verdict of $2,500. Under the reasons given in the cases discussed herein and many others for awarding punitive damages, we cannot say that the award here was excessive and change it for “exceptional causes.”
AFFIRMED.
*813 PATTERSON, C.J., and ROY NOBLE LEE, HAWKINS and DAN M. LEE, JJ., concur.
ROBERTSON and PRATHER, JJ., specially concur.
WALKER and BROOM, P.JJ., dissent.
APPENDIX A
[[Image here]]
*814 [[Image here]]